## WALDRON v. AETNA CASUALTY & SURETY CO.

### No. 8375.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 19, 1943.

Decided Feb. 14, 1944.

B. Nathaniel Richter, of Philadelphia, Pa., for appellant.

Joseph W. Henderson, of Philadelphia, Pa. (Rawle & Henderson and George M. Brodhead, Jr., all of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, MARIS, and JONES, Circuit Judges.

JONES, Circuit Judge.

James J. Waldron, the plaintiff, brought an action in the District Court against the defendant, sounding in tort, for damages for breach of an alleged contract providing for an operation to be performed upon him for the relief of a disability caused him by a serious injury which he suffered in the course of his employment. The defendant was the insurer of the plaintiff's employer (Mitchell & Pierson, Inc., leather manufacturers, of Philadelphia) against liability for compensation to employees under the Pennsylvania Workmen's Compensation Acts of 1915, P.L. 736, as amended, 77 P.S. § 1 et seq. Federal jurisdiction of the case rests upon the diversity of the citizenship of the parties.

The plaintiff suffered an admittedly compensable injury on October 27, 1941, when his left hand was severely burned upon being caught between two rollers used in the process of tanning leather. Immediately after the accident he was given first aid treatment in the Graduate Hospital of Philadelphia and then sent home. About a month later, to wit, on November 26, 1941, a hemorrhage in the injured hand necessitated the plaintiff's removal to the hospital where he remained until December 3, 1941. While in the hospital, he was under the care of one Dr. John C. Howell, who was also in charge of the clinic of Mitchell & Pierson, Inc., at their factory. After leaving the hospital, the plaintiff was treated by Dr. Howell at his private office in Philadelphia.

The plaintiff received compensation under the Pennsylvania Act from the date of his injury and was still receiving it at the time

of the trial of the suit here involved. Under that Act, as amended (Act of 1939, P.L. 520, 77 P.S. § 531), an employer is also liable for reasonable surgical and medical services to a compensably injured employee for the first sixty days after the disability begins, at a cost not to exceed $150.00.

It is events subsequent to the sixty day period following the plaintiff's injury and their legal effect which give rise to the present controversy. Thus, the plaintiff alleges that, more than sixty days after his injury, a duly authorized representative of the defendant company persuaded and induced him to submit to further operations on his injured hand for the purpose of alleviating or at least minimizing the disability incident to the injury; and that, after certain preliminary operations had been performed for the purpose of the corrective treatment, the defendant summarily and unjustifiably abandoned the course of treatment entered upon, thus leaving the plaintiff with a wholly disabled and unusable hand and otherwise physically impaired to his great pecuniary loss and damage.

The defendant denies liability to the plaintiff on the ground that the representative said to have acted for it in respect of the agreement, which the plaintiff alleges, was without authority to bind the defendant; that no such arrangement was in fact made by the defendant's representative; and that the defendant's liability, which is that of an insurer of the employer, is limited under the Pennsylvania Workmen's Compensation Act, with respect to surgical and medical services, to the period of sixty days following the plaintiff's disability.

At the conclusion of the trial, the court granted a motion by the defendant for a directed verdict on the ground that the plaintiff had failed to prove that Dr. Howell, in undertaking the skin grafting operation, was acting for the defendant rather than Mitchell & Pierson, Inc. (the plaintiff's employer) and also had failed to prove that the representative who acted in the matter for the defendant company had authority to bind his company in such regard. From the judgment entered on the directed verdict the plaintiff took this appeal.

From the evidence offered in behalf of the plaintiff the following either directly appears or is reasonably inferable.

On January 21, 1942 (approximately three months after the date of the plaintiff's injury), Dr. Howell wrote the defendant company as to the plaintiff's condition and the treatment which he proposed for the future. This letter was written in response to a request by the defendant for a report. In his letter, Dr. Howell described in complete technical detail the condition of the plaintiff's injured hand and proposed that skin grafting operations be performed which, in his opinion, would heal the hand to such an extent that the plaintiff's disability would completely disappear by April following. In response to Dr. Howell's report, one James J. MacDonnell, supervisor of workmen's compensation claims for the defendant company, at its Philadelphia office, had a telephone conversation with Dr. Howell in the course of which the proposed skin grafting treatment was further discussed. MacDonnell was told by Dr. Howell that he (and Mitchell & Pierson, Inc., the plaintiff's employer)[1] had arranged to have the plaintiff admitted to the Graduate Hospital for the proposed skin grafting operation and that the extent of the necessary hospitalization would likely be from seventeen to nineteen days. To this information MacDonnell replied, "All right, go ahead." The defendant insurer stood to benefit pecuniarily if the plaintiff's disability could be terminated as Dr. Howell prognosed. The plaintiff's employer had no such material interest. Its liability was fixed by the State Compensation Act against which it was fully insured by the defendant.

Shortly thereafter, to wit, on February 2, 1942, the plaintiff (without knowledge of the plans or arrangements for his hospitalization) called at the offices of the defendant company in Philadelphia pursuant to a summons by a representative of the defendant. There, he was interviewed by MacDonnell and one Dr. Coppedge, a medical adviser to the defendant company.

---

[1] The parenthesized portion appears in the testimony of Dr. Howell who was called as a witness for the plaintiff. In view of all the evidence in the case, the jury would have been justified in disregarding this reference to the employer. A reading of the record impels the conclusion that Dr. Howell was at great pains in his testimony to exculpate the insurance company from any participation in providing for the operation.

MacDonnell told the plaintiff that "We have arranged for you to go to the Graduate Hospital tomorrow to have a skin graft done to bring back the use of your hand." The plaintiff was reluctant to go to the hospital and, at first, demurred. But, upon being urged by MacDonnell, and assurances from Dr. Coppedge that Dr. Howell was a good surgeon and that the operation was the thing for the plaintiff if he hoped to recover the use of his hand, the plaintiff assented and entered the hospital on February 3, 1942.

That same day (February 3, 1942) Dr. Howell performed the first of the skin grafting operations upon the plaintiff and made a report thereof to the defendant company by letter of February 5, 1942. The plaintiff remained in the hospital until April 2, 1942, and thereafter continued to receive treatment by Dr. Howell at the latter's office. As a result of the operation and treatments, the plaintiff had scars on his hips and thighs from which skin had been lifted for transplantation to his abdomen, where it formed a roll or protuberance resembling a sausage, which has caused him discomfort. Had the skin grafting operation been completed, the roll of skin on the plaintiff's abdomen would have been transplanted to his injured hand.

On March 24, 1942 (nine days before the plaintiff was discharged from the hospital) Dr. Howell had sent the defendant company a report on the plaintiff's condition in which he stated that the plaintiff would need further operations and that, after they were performed, the plaintiff would have a possibly fifty per cent use of the injured hand. The next day (March 25, 1942) Dr. Howell also sent to the defendant company his bill for all treatments rendered the plaintiff including the operations subsequent to the sixty day period following the injury. The bill contained a notation that Mitchell & Pierson, Inc., was the plaintiff's employer. The defendant retained this bill and report, without comment for a matter of two months. During that time it caused the case to be given further study and then finally decided not to carry on with the operation. Accordingly, on May 28, 1942, the defendant paid Dr. Howell for his services to the plaintiff during the sixty day period immediately following the injury and denied liability for any services rendered the plaintiff beyond that time. Although Dr. Howell was on an annual retainer from Mitchell & Pierson, Inc., for medical services rendered that company's employees at the clinic at its factory, the defendant company always paid him separately for treatment he gave employees of Mitchell & Pierson, Inc., at his own office and for hospital cases and all injury cases treated at the factory.

On June 29, 1942, MacDonnell called the plaintiff to the defendant's office and there informed him that he (MacDonnell) had no authority from his company's home office to grant post-statutory medical or surgical treatment and suggested that the plaintiff try to get a lump sum payment of compensation in order to have himself fixed up. Late in October 1942 MacDonnell told the plaintiff that he would try to re-open his case. It had been Dr. Coppedge's opinion that the skin grafting operation should be proceeded with at the defendant's expense. Subsequently, MacDonnell telephoned the plaintiff's home and left word that the defendant could do nothing for him. The plaintiff has been financially unable to have the skin grafting operation completed. As a result, he has lost the use of his injured hand almost entirely and is otherwise physically impaired, as already described, because of the uncompleted operations performed upon him.

The defendant's evidence was that no one outside of its home office at Hartford, Connecticut, was authorized to bind the company for post-statutory surgical or medical services in workmen's compensation cases; that, specifically, MacDonnell had no authority so to bind the company; that he had not induced the plaintiff to submit to the skin grafting operations; neither had he authorized the operation nor had he made the hospital arrangements for the plaintiff's operation; and that, although MacDonnell had twice recommended to his company's home office that the operation be authorized, his recommendations were rejected. The defendant also offered evidence to deny that Dr. Coppedge had authority to bind the company for post-statutory treatment in compensation cases.

▇▇ Jurisdiction of the case resting upon diversity of citizenship, the substantive rights of the parties are to be determined according to local law. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. By the law of the forum, which in this

instance is Pennsylvania, the applicable local law is the law of that State. See Restatement, Conflict of Laws (1934) § 311. Thus the place of contracting is found to be Pennsylvania. The agreement for the performance of the skin grafting operations, as averred by the plaintiff, was entered into in that State and was, moreover, to be performed there. The pertinent law is, therefore, to be found in Pennsylvania's own substantive rules. Ibid. § 332. See National Beverage Sales Co. v. Weinstein, 303 Pa. 387, 388, 154 A. 595. The Pennsylvania cases support the above statements of the law. See Restatement, Pennsylvania Annotations (corresponding sections).

Underlying the questions (1) as to whether MacDonnell had authority to bind the defendant company in respect of the undertaking averred by the plaintiff and (2) even if so authorized, whether he actually committed the company in such regard, is the question of the sufficiency of the evidence. While questions of evidence ordinarily relate to matter of procedure, the sufficiency of the evidence goes to the maintenance of the substantive right and is, therefore, to be tested by local law in cases where such law controls. See Stoner v. New York Life Insurance Co., 311 U.S. 464, 468, 61 S.Ct. 336, 85 L.Ed. 284; Lennig v. New York Life Ins. Co., 3 Cir., 122 F.2d 871, 872.

We think there is abundant evidence in the record to support a jury's finding that MacDonnell undertook on behalf of the defendant company to have it stand good for the costs and expenses of the skin grafting operation to be performed on the plaintiff; that, pursuant to and in reliance upon that undertaking, such an operation was immediately entered upon; and that the defendant unjustifiably repudiated and abandoned the undertaking, midway in the course of the treatment, to the plaintiff's great harm and damage. To conclude, as did the trial court, that Dr. Howell acted in respect of the operation as the employee of Mitchell & Pierson, Inc., and not of the defendant, is possible only by usurping the function of the jury. The provision in the Pennsylvania Compensation Act that the employer shall be liable for surgical and medical services only for sixty days following the disability resulting from an injury is a limitation in favor of the defendant but not a restraint upon its power to contract. Indeed, it was to the defendant's material interest to have the plaintiff's disability removed if that could be done promptly and at not too great an expense. Dr. Howell, who had been in direct communication with MacDonnell and other representatives of the defendant's Philadelphia office in connection with the plaintiff's treatment, quite evidently understood that it was the defendant that was having the skin grafting operation performed when, five months after the accident, he sent to the defendant his bill for services to the plaintiff including the post-statutory operative treatments. He admittedly knew that the law limited the liability for surgical and medical services to the sixty day period following the disability.

The one fundamental legal question here present is whether MacDonnell was authorized to bind the defendant in respect of the post-statutory operation on the plaintiff. It is our opinion that, under the evidence in the case, that question was for the jury. Singer Manufacturing Company v. Christian, 211 Pa. 534, 540, 60 A. 1087; Edwards & Strong v. Power Gasoline Company, 109 Pa.Super. 252, 255, 167 A. 487. Opposed to the bald statements of witnesses for the defendant that MacDonnell was without authority so to bind the defendant, there was plenty of evidence in the case from which his authority, either actual or apparent, could reasonably have been inferred by the jury. In the Singer case, supra, the State's highest court said (page 540 of 211 Pa., page 1088 of 60 A.) that,—"The fact of agency and the scope of the power of an agent are questions for the court, where the authority is created by an instrument in writing; but where such authority is to be implied from the conduct of the parties, or where the agency is to be established by witnesses, the fact and scope of the agency are for the jury. 1 Am. & Eng. Ency. of Law (2d Ed.), p. 968."

A principal may not hold out his agent as having authority to deal with respect to certain matters (here the supervision and adjustment of compensation claims) and then restrict the authority by secret limitations that will be binding upon third persons who rely upon the general authority which the principal has caused or permitted the agent apparently to possess. In such circumstances, a principal may even be bound for a wholly unauthorized act on the part of the agent. Lauer Brewing

235

Company, Limited v. Schmidt, 24 Pa.Super. 396, 401; cited and followed in La France Workshop Lampshade Company, Inc., v. Buffalo Insurance Company, 318 Pa. 191, 196, 178 A. 1. See also Restatement, Agency (1933) § 161.

In the light of MacDonnell's position as the defendant's supervisor of compensation cases, there was nothing out of the ordinary in his conduct in arranging and providing for the operation (if a jury should find that he did so) which should have caused the plaintiff to be on notice of any limitation upon his authority. Under the Pennsylvania Compensation Act, it was the right of the insurance company to require the claimant to undergo reasonable surgical and medical treatment and to submit to further medical examination before or after an award if it so saw fit. The claimant's refusal to acquiesce or cooperate would be ground for denying him compensation. Act of 1939, P.L. 520, § 1, 77 P.S. §§ 531, 651. MacDonnell's accredited position was a sufficient indication that his company had entrusted him with the general supervision of compensation claims at its Philadelphia office. All the men who worked in that department came under MacDonnell's authority and he dealt directly with the public and the insured patrons of his company in respect of workmen's compensation claims against them. We think it is indisputably clear that there was sufficient evidence of MacDonnell's apparent authority to have required the submission of that question to the jury. Singer Manufacturing Company v. Christian, supra; see also Empire Implement Manufacturing Company v. Hench, 219 Pa. 135, 142, 67 A. 995; Farneth v. Commercial Credit Company, 313 Pa. 433, 440, 169 A. 89.

The defendant's further contention that MacDonnell was a so-called "special" and not a general agent is without present legal significance. Even though a special agent, there is quite sufficient evidence to support a finding that he had apparent general authority for the purpose of his special agency, viz., the supervision of compensation claims. See Brooke v. New York, Lake Erie & Western R. R. Co., 108 Pa. 529, 540, 1 A. 206, 56 Am.Rep. 235, where it was said in this connection that "The question is, nevertheless, primarily one of facts and circumstances, and until these are ascertained it is not possible to draw legal inferences." In other words, the case is for the jury.

The judgment of the District Court is reversed and the case remanded for a new trial.